duty of the decedent to look out for himself. If by reason of his conspicuous uniform he could be readily distinguished by the motorman, so the sweeper, with his knowledge of the frequent movements of cars upon the tracks, could have easily seen the approaching trolley car if he had looked. Although he was there as of right and in the performance of his duties, yet nevertheless this did not relieve him of all responsibility.

From the fact that the car was stopped within its own length after the accident, it is evident that the motorman had it under control. It is not to be presumed that he deliberately ran down the sweeper. From the facts proven the inference is as readily drawn that the sweeper suddenly stepped in front of the car, and so close thereto that it was impossible for the motorman to stop in time to avoid the collision, as it is that the accident was due to the want of vigilance of the motorman. In other words, the plaintiff, having the burden, has failed to show that the accident was due to the negligence of. the defendants' servant, and that her intestate was free from contributory negligence.

The defendants moved to dismiss at the close of the plaintiff's case, and, standing upon their exception, put in no evidence. The judgment and order appealed from should be reversed and the complaint dismissed, with costs to the appellants. All concur.

---

### RUPERT v. HUDSON & M. R. CO.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

MASTER AND SERVANT (§ 286*)—INJURY TO SERVANT—ELEVATOR ACCIDENT—EVIDENCE—JUDGMENT.

Where, in an action for injuries to a carpenter, working under the direction of defendant's foreman, from the moving of an elevator on the top of which he was riding, there was not only a preponderance of the evidence against plaintiff's claim that the foreman gave the signal pursuant to which the elevator was moved, but there was no evidence that the order given was an order to the operator to move the elevator immediately without waiting to ascertain that plaintiff had alighted, a judgment for plaintiff was unauthorized.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

Appeal from Trial Term, New York County.

Action by Martin Rupert against the Hudson & Manhattan Railroad Company. From judgment for plaintiff and denial of new trial, defendant appeals. Reversed, and a new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

Walter L. Glenney, of New York City, for appellant.

Edwin J. Dryer, of New York City, for respondent.

LAUGHLIN, J. On the 11th of November, 1911, the plaintiff was in the employ of the defendant at its office building No. 30 Church

street in the borough of Manhattan, New York, as an assistant carpenter under the foremanship of one Kraft, and while in the performance of his duties sustained personal injuries, to recover damages for which he brought this action, after giving defendant notice pursuant to the provisions of article 14 of the Labor Law (Consol. Laws 1909, c. 31), on the ground, among others, that through the negligence of the defendant, "its superintendents and agents and persons in its employ for whose negligence it is liable under the provisions of article 14 of the Labor Law and the acts amendatory thereto," an elevator, on top of which he was riding, was moved upwards, pinioning him between it and the top of a door opening into the elevator shaft.

It was contended upon the trial, and is argued here by counsel for appellant, that the notice under the Labor Law was insufficient. We have considered the point and are of opinion that the notice was sufficient and do not deem discussion of the objections thereto necessary.

Under the charge of the learned trial court, the verdict was necessarily predicated upon a determination that the elevator was started by one Hogan, called "Paddy," who was employed by the defendant to operate it, pursuant to an order given by Kraft, while plaintiff was in the act of descending from a box platform on top of the elevator through an opening of about 3½ feet or less, according to the opinion evidence, and 2 feet and 1 inch by actual measurement, between the top of said platform and the top of a door opening into the elevator shaft from a stationary platform several feet below. The platform, onto which plaintiff was in the act of descending, was at that time just above Hogan's head and, according to actual measurement made with the elevator, down on the bumpers, where the uncontroverted evidence shows that it was, 4 feet 5½ inches above the floor from which Hogan operated the elevator. There is evidence, the weight of which we do not now deem it necessary to consider, tending to show that Kraft gave an order, to comply with which it was necessary for Hogan to move the elevator up to the platform from which the door into the elevator shaft opened; but, if there was any evidence legitimately tending to show that such order was negligently given, it is wholly insufficient to sustain the verdict on that point. The arguments of counsel for the respective parties in regard to the interpretation or construction of the signal or order given to Hogan are diametrically opposed.

There was an elevator, known as a donkey elevator, operated in a shaft extending from the Dey street entrance to the building to the platform onto which plaintiff was attempting to descend. That was a freight elevator, and it was used exclusively for bringing material, supplies, and other freight to this platform, from which it was transferred to elevator No. 17, from which plaintiff was descending when injured, and by it conveyed to the different floors of the building. If there was room in the lower part of elevator No. 17, the freight was placed there; but, for carrying articles that could not be placed in the lower part of the elevator, a box platform had been so constructed on top of it as to carry, and by the boarded up sides to sup-

port, lumber and like articles, and such freight was placed on the box platform on top of the elevator to be carried to the other floors.

Shortly before the time of the accident Kraft directed one Lawson, a carpenter working under him, and the plaintiff and one Kornhauser, a glazier, to take some 2x4 scantling by the donkey elevator and elevator 17 to the ninth floor, to be used in erecting a partition. Plaintiff and the other two men transferred the scantling· from this platform at the top of the donkey elevator shaft to the box platform on top of elevator 17. Lawson assumed charge of directing Hogan, who was operating the elevator, with respect to the movements thereof. Plaintiff and his fellow workmen rode on the top of the elevator to the ninth floor, where it was stopped at a point convenient for stepping off onto that floor. When the elevator arrived there, plaintiff stepped out, and, by Lawson's direction, the elevator was lowered a sufficient distance to permit the scantling to be taken through the door opening into the elevator shaft at the ninth floor. The other two men remained on top of the elevator and passed the scantling off to plaintiff. When the material was unloaded, Hogan, again by Lawson's direction, brought the top platform of the elevator to a·level with the ninth floor, and plaintiff rejoined his associates on top with a view to descending to and alighting at the platform at the top of the donkey elevator shaft. When the elevator reached that platform, Hogan, in order to enable the men on top to alight, slid open the galvanized door opening from the platform into the elevator shaft and then lowered the elevator as far as it would go, to the bumpers at the bottom of the pit, which, as has been stated, was 4 feet 5½ inches. That left an opening between the top of the door and the top of the box platform on top of the elevator, the width of which has already been stated, through which Kornhauser and Lawson descended. Hogan knew that all three of the men were to descend onto this platform, and he also knew that only two of them had so descended, and he could see part of their bodies as they stood on the platform, when he started the elevator and caused the accident. The plaintiff testified that at this time, and while he was in a stooping or sitting position and just putting his head in the door to jump out, he heard a voice which he recognized as Kraft's call out, "Come up, Paddy," and at the same "moment," "instant," or within about "a second, the very same instant," the car started, and, realizing the danger, he called out to stop, but it was too late, and he was caught between the platform on top of the elevator and the top of the door. According to plaintiff's testimony, he did not see Kraft at the time and could not tell by the sound of the voice where Kraft was or whether the sound of the voice came from above or below, but "it seemed to be close by" and "could not be very far away."

The notice of liability under the Labor Law was given by plaintiff's former attorney, to whom, he says, he stated the facts, and he claims that he stated them the same as on the witness stand. The notice charges negligence on the part of the defendant and its superintendent and agents, but it contains no specification of the order upon which negligence is now predicated. The complaint is in like general terms; but both notice and complaint charge negligence with respect to the

condition of the elevator itself; and, in a bill of particulars which the former attorney testified he prepared from information given by the plaintiff and acquired by investigation, the negligence charged is in substance that the elevator was so out of repair that it "started of and by itself," that the operator was incompetent, and that defendant failed to warn him of these facts and failed to make and promulgate proper rules, and negligently conducted its business, but there is no reference to any order of the superintendent or of any one else pursuant to which the elevator was started.

Kornhauser corroborated the plaintiff with respect to the circumstances attending the accident, with the exception that he says the call he heard was, "Come up, Pat;" and he testified positively that he recognized the voice as Kraft's and that the sound of the voice came up the donkey elevator shaft from the driveway underneath the platform on which he was standing. The record does not clearly show the fact, but it is fairly to be inferred, I think, that elevator No. 17 was operated, as elevators usually are, by electric signals, with the exception of its operation in connection with the donkey elevator; that is, when carrying men and freight on top. The donkey elevator was operated from the platform at the main floor by two electric buttons. Pressing one of them would send it down, and pressing the other would bring it up. It could not be operated from any other point. Under the rules of the defendant, no one other than Hogan, who was operating elevator No. 17, was permitted to operate the donkey elevator. When elevator No. 17 was away from this platform at the top of the donkey elevator shaft, the door opening from that platform into the shaft of elevator No. 17 was closed. There was a custom on the part of the defendant's employés and others, having material to deliver in the building, to call out from the foot of the donkey elevator shaft at the Dey street entrance, "Paddy, come down," if the donkey elevator was at the top of the shaft when they wished to use it, and "Paddy, come up," if it was at the foot of the shaft and ready to be elevated, and they were obliged to wait until Hogan, in passing this platform, heard them, or until he happened to open the door and step out onto the platform and look down the donkey elevator shaft and see them. If Hogan was in the elevator when he heard such a signal, in order to comply with it, it was necessary to bring the platform of elevator No. 17, on which he was standing, to the level of the stationary platform and open the door and step across that platform and touch the proper electric button. On the occasion in question, therefore, whether he understood the signal he heard to be a signal for the donkey elevator, or whether he understood it to be a signal to move elevator No. 17, it would be necessary for him, in order to comply with it, to move elevator No. 17 upward.

The point on which counsel differ in their view of the evidence is with respect to whether the signal to Hogan was to move elevator No. 17 up for some use by itself or merely to touch the button to bring the donkey elevator up. The testimony of Hogan does not make it very clear whether he understood the signal to be to move elevator No. 17 up or to touch the electric button and bring up the donkey

elevator; but if the signal he heard was, "Paddy, come up," as testified to by the plaintiff and repeatedly testified to by himself, it is perfectly clear from the other evidence that that signal was one used with respect to the donkey elevator. Hogan testified that the customary signal given to him by Lawson in operating the elevator while using the box platform in carrying materials to and from the different floors of the building was, "Come up," or "Come down," as the case might be. At one place in his testimony, in referring to the signal which he heard on the occasion of the accident, he states it as "Come up," and says that he could not say whether or not it was Lawson's voice. He says that the sound of the voice appeared to come from above. It is fairly to be inferred from his position that it would so appear to him whether the sound came up the donkey elevator shaft, as testified to by his witness Kornhauser, or whether it came from directly above him. He does not say whether the voice sounded near or far. Lawson says that the only signal he heard was just as Hogan opened the door for them to alight on the platform, and that it came from the foot of the donkey elevator shaft and was, " 'Take us up,' or something like that," and that Paddy's name was not mentioned in it. Other evidence in the case shows that there were three men, not in the employ of the defendant, with material waiting to be taken up in the donkey elevator. One of them testified in behalf of the defendant. Another was in Ireland at the time of the trial; and the third was not identified. The one who testified says in substance that he was familiar with the manner of signaling Hogan to operate the donkey elevator, as already stated; that he put a load of blocks into the elevator at that time to be taken up to the ninth floor, but that he did not signal Hogan or hear any signal; and that Kraft was not in the donkey elevator or around there. Shortly after the accident Kornhauser made an affidavit in which he stated that he heard no signal given to Hogan to move the elevator. Kraft testified that he had been up on the ninth floor; and there is other evidence tending to show that he came up while plaintiff was there, that he went from there by one of the local passenger elevators to the superintendent's office on the third floor, where he remained about ten minutes, and then returned to the ninth floor, and first learned of the accident when he arrived on the ninth floor, and that he first saw the plaintiff after the accident in the doctor's office on that floor.

Much stress appears to be laid in favor of the plaintiff on the fact that the testimony of Kraft is contradicted by Kornhauser, who says that Kraft appeared on the platform at the main floor before the plaintiff was removed to the doctor's office; but he was unable to give any satisfactory explanation as to how Kraft could have arrived there so soon if he gave the signal from below on the driveway; for he admitted that the donkey elevator was not operated and that there was no other way by which access to that platform could be obtained except by stairs; and his testimony also indicates that a door to which Kraft had a key, opening onto the platform, would have had to be unlocked, and that the sweep of the door would cover about one-half the platform, and that he did not observe it. If Kraft gave this signal from

the driveway below, manifestly he could not know the position of the plaintiff at the time; and it is perfectly evident that any signal by Kraft, or any one else, to Hogan to operate the donkey elevator was not a command to immediately operate it and could not have been intended or understood as indicating to Hogan that it was safe for him instantly to move elevator No. 17. The evidence discloses no occasion, unless it be for moving the donkey elevator, for Kraft's giving any signal or order at this time to Hogan to move the elevator. Counsel for respondent in his points expressly disclaims any charge of negligence against Kraft for giving the customary signal to move the donkey elevator. His sole contention is that the signal was to bring elevator 17 up. It is utterly improbable that he would summon the elevator to take him from the third to the ninth floor, when there were many passenger elevators which he could use without interrupting the work which the plaintiff and his associates were performing. It is difficult to understand why Hogan moved the elevator at that time unless be understood the signal to be from one of the three men who were using it, or accidentally started it too soon. If he moved it with a view to comply with a signal to operate the donkey elevator, or one given by Kraft from some upper floor in the building to bring elevator 17 up, it would seem that it was gross negligence on his part to start the elevator without knowing whether plaintiff would be endangered thereby.

The evidence preponderates against the claim of the plaintiff that Kraft gave the signal; but, if he did, there is no evidence pointing to the fact that it was intended as an order to the operator to move the elevator immediately, or was so understood. Inasmuch, however, as this work was conducted in a manner fraught with great danger to defendant's employés, plaintiff may have a cause of action, and we deem it proper to grant a new trial.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.